**So Ordered.**

**Dated: July 27th, 2020**



*NOT FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 19-01040-WLH13 |
| JUAN ANTHONY ZAMORA and SHAMIKA FAYE ZAMORA, | **MEMORANDUM DISPOSITION RE DENIAL OF CONFIRMATION AND DISMISSAL OF CASE** |
| Debtors. | |

Most bankruptcy cases proceed smoothly, but some don't. When the difficult cases hit a crossroads, the bankruptcy court will usually survey the situation and, based on the totality of the circumstances presented, determine how best to proceed. This is a difficult case at a crossroads.

The specific issues here involve whether the debtors have engaged in unreasonable delay that is prejudicial to creditors, filed their case in bad faith, or fomented other "cause" to dismiss or convert this chapter 13 case. If so, the court must decide between dismissal or conversion based on the best interests of the stakeholders and bankruptcy estate. For reasons explained below, the court dismisses this case.

## BACKGROUND & PROCEDURAL POSTURE

In June 2018, the debtors unfortunately suffered fire and smoke damage to their residence and personal property resulting in the total loss of a 1994 Chevrolet Camaro and approximately $60,000 of damage to the contents of their garage and

MEMORANDUM DISPOSITION . . . Page 1

residence.[1]  The debtors contracted with Scotco Construction, Inc. d/b/a Northwest Restoration to repair the damage to the residence.[2]  At some unspecified time, a dispute arose between the debtors and Scotco about whether the debtors paid Scotco all insurance monies the debtors received intended for the residential repair. During the claims process, the debtors' insurance carrier sent the debtors a letter listing the personal property losses that the debtors reported as a result of the fire.[3] The inventory spans 29 pages, contains 552 entries, and shows that the debtors reported a loss of personal property valued at $58,900.80.[4]

On April 23, 2019, the debtors filed a chapter 7 petition giving rise to the bankruptcy case at issue here.  The debtors disclosed their interests in unencumbered personal property with an aggregate value of $6,800, cash and deposits of $30, and a retirement account containing $40,714.[5]  The debtors did not identify Scotco as a creditor or otherwise list the creditor in their statements and schedules.[6]

In June 2019, the chapter 7 trustee reported that he found no assets available for distribution to creditors.[7]  A few weeks later, the trustee reversed course and withdrew this report.  At the same time, the trustee obtained authorization to employ counsel to assist "in liquidating and collecting property of the estate and any related claims."[8]

Scotco then filed an adversary proceeding seeking a nondischargeability determination regarding its claim against the debtors.[9]  Scotco alleges that a contract between the parties placed the debtors in a trustee relationship regarding any funds received from their insurance company intended to pay for the residential repair.[10]  Scotco further alleges that the debtors failed to transfer to

---

1   *See* Statement of Financial Affairs, ECF No. 1 at ¶ 15.

2   *See* Adv. Proc. No. 19-80021, Complaint at ¶ 3.3.

3   *See* ECF No. 95, Ex. 1.

4   *Id*.

5   *See* ECF No. 1, Sch. A/B.  The value of the personal property excludes interests in vehicles and watercraft.

6   *See id*.

7   ECF No. 18.

8   *See* ECF Nos. 20, 21, 23.

9   Adv. Proc. No. 19-80021.

10  *Id*., ECF No. 1 at ¶ 3.7.

Scotco $58,883.76 that the debtors received from their insurance carrier for such purposes.[11] Scotco argues that the debtors' actions rise to the level of fraud, misrepresentation, and malice sufficient to except Scotco's claim from the bankruptcy discharge under 11 U.S.C. § 523(a)(2), (4), and (6).[12] With the consent of the parties, the court has largely held the adversary proceeding in abeyance pending the outcome of the main bankruptcy case.

In September 2019, after receiving an extension of time to do so, the U.S. trustee moved to dismiss the case for abuse under 11 U.S.C. § 707(b).[13] Notably, the trustee sought relief under a provision requiring a bankruptcy court to consider whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."[14] In support of the motion, the trustee alleged that the debtors understated their monthly income by approximately $1,000, inappropriately claimed monthly payroll deductions of approximately $762, and overstated monthly necessary expenses by approximately $510.[15] The trustee's computations revealed that the debtors' projected disposable monthly income amounted to $2,183, rather than the claimed negative monthly income of $89, rendering a difference of $2,272.[16] Because this recomputation showed that the debtors could pay a substantial portion of their unsecured debts, the trustee asked the court to dismiss the chapter 7 case for abuse.

In their response entitled "objection to trustee's motion to dismiss chapter 7 case," the debtors did not dispute the U.S. trustee's allegations but asked the court to deny the motion based on their desire to convert the case to one under chapter 13.[17] On November 7, 2019, the court granted the debtors' motion to convert their case.[18] The U.S. trustee's motion to dismiss remains pending.

Soon after conversion, the debtors filed several documents. An amended Statement of Financial Affairs disclosed that the debtors received $123,224.59 of

---

[11] *Id.* ¶¶ 3.5, 3.6.

[12] Shortly after conversion, Scotco filed a proof of claim showing an unsecured debt of $56,883.76. *See* Claim No. 12.

[13] ECF Nos. 26, 31, 32.

[14] 11 U.S.C. § 707(b)(3)(B).

[15] ECF No. 32 at 2-4.

[16] *See id.* at 4, ECF No. 1, Sch. J.

[17] *See* ECF No. 34.

[18] *See* ECF Nos. 36, 37.

insurance proceeds that they transferred to Scotco in 2018 and 2019.[19]  Amended Schedule B disclosed an interest in "insurance on the house" valued at $15,174.61.[20]  Amended Schedule F identified Scotco as an unsecured creditor.[21]  Amended Schedules I and J collectively raised the debtors' gross monthly income by $1,764, increased their payroll deductions by $706, and decreased their monthly expense by $691, which collectively rendered disposable monthly income of $1,660.[22]  The debtors also filed a statement declaring that the information contained in the balance of their statements and schedules remained correct.[23]  Finally, the debtors filed a chapter 13 plan proposing monthly plan payments equal to their newly found disposable monthly income.[24]

At the end of November, the attorney for the chapter 7 trustee applied for compensation and costs in the newly converted chapter 13 case totaling $1,806.95.[25]  The billing entries attached to the application reveal that counsel investigated whether funds from "insurance checks" belonged to and were recoverable by the estate.[26]

Also in November, the chapter 13 trustee[27] filed the first in a series of objections to confirmation of the debtors' plan.  Many of the bases mirrored those the U.S. trustee asserted in its motion to dismiss the chapter 7 case for abuse.  Relevantly, the chapter 13 trustee's objections included that the debtors:

---

[19] *See* ECF No. 44 at ¶ 18.

[20] *See* ECF No. 45 at ¶ 31.

[21] *See id*.  The debtors identified Scotco as "Northwest Restoration."

[22] *See id*.  The debtors did not reduce or eliminate any expenses the U.S. trustee found objectionable but retained or even increased these expenses.

[23] ECF No. 46.

[24] ECF No. 47.  Because the debtors initially claimed negative monthly income of $89, they had no choice but to amend their schedules to show income sufficient to fund a chapter 13 plan.

[25] ECF No. 60.

[26] *See id*.

[27] To an outsider, it may seem like the bankruptcy process has a surfeit of trustees.  Three trustees have played roles in this case, but each serves a different function.  The U.S. trustee is part of the Department of Justice and is charged with, among other things, acting as a "watchdog" in bankruptcy cases to prevent misconduct and protect the integrity of the process.  *See, e.g.*, 28 U.S.C. § 586; 11 U.S.C. § 307.  A chapter 7 trustee is a private party appointed to, among other things, liquidate the assets of an estate under that chapter of the Bankruptcy Code, including potentially pursuing litigation claims.  *See* 11 U.S.C. § 704.  A chapter 13 trustee is also a private party who, among other things, performs certain duties of a chapter 7 trustee and takes an active role in the chapter 13 plan process (such as by objecting to unconfirmable plans and administering certain payments).  *See id.* § 1302.

- failed to provide recent tax returns, bank statements, and pay stubs, which prevented the trustee from verifying the debtors' disposable income and determining the required length of their plan;

- claimed excessive and unnecessary expenses and payroll deductions and increased such items above the amounts to which the U.S. trustee had already objected;

- testified at the meeting of creditors that they received insurance proceeds as a result of the fire damage – because the schedules failed to reflect this, the trustee sought the inventory of damaged items sent to the insurance company; and

- failed to completely disclose their interests in personal property – the trustee based this objection on documentation the debtors provided showing that they (i) received insurance proceeds of $47,240.10 before filing their chapter 7 petition to replace damaged personal property but listed personal property valued at only $6,800 and (ii) purchased personal property totaling $27,754 within a year of filing their chapter 7 petition, including ATV parts despite not disclosing any interest in an ATV.

The trustee also challenged confirmation based on the debtors' failure to address or accurately provide for several claims filed or disclosed by the debtors.[28] After the first continued confirmation hearing and concurrent with his last objection, the trustee finally moved to deny confirmation and dismiss the chapter 13 case.[29] The motion and objections remain pending.

In mid-March 2020, the debtors filed their only plan modification addressing the trustee's objections related to the improper or lack of treatment for certain claims.[30] The modification does not address the trustee's concerns bulleted above or the objections asserted by the trustee and the debtors' mortgage servicer related to the debtors' mortgage arrears. The mortgage servicer's objection remains pending.[31]

---

[28] *See* ECF Nos. 56, 68, 75, 79.

[29] *See* ECF No. 80.

[30] *See* ECF No. 83.

[31] *See* ECF No. 74.

The next day, the debtors filed a second set of amended schedules. Amended Schedule B disclosed additional personal property identified as a Polaris Scrambler and a Polaris Sportsman with an aggregate value of $5,200, and increased the value of items listed under the general description of "Household Goods and Furniture" by $8,900 bringing the total value from $6,800 to $15,700.[32] The debtors also amended Schedule C to exempt an interest in the full $15,700.[33]

On May 14, 2020, the chapter 13 trustee moved to reconvert the case to one under chapter 7.[34] The trustee contends that the debtors had not filed the case in good faith, that the plan does not comply with section 1325 and does not represent a fair and equitable distribution to creditors, and that dismissal would cause creditors an undue hardship. The trustee's motion is based almost entirely on the assertion that the debtors failed to properly value and disclose personal property.

## JURISDICTION & POWER

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding confirmation of the debtors' proposed plan is statutorily "core"[35] and "the action at issue stems from the bankruptcy itself."[36] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

## DISCUSSION

### *Bankruptcy Purposes and Principles Generally*

Throughout the nation's history, bankruptcy cases in the United States have served various and sometimes competing functions.

In its infancy, bankruptcy was a creditors' remedy intended to facilitate debt collection. Under the short-lived Bankruptcy Act of 1800, creditors who could

---

[32] *See* ECF No. 85.

[33] *See id.* On March 26, 2020, the chapter 13 trustee objected to the debtors' exemptions on the general basis that the debtors failed to provide a detailed list of the items exempted, thereby preventing the trustee from properly assessing such items.

[34] ECF No. 93.

[35] *See* 28 U.S.C. § 157(b)(2)(L).

[36] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

prove that a merchant committed an act of bankruptcy could seek to have the debtor declared a bankrupt, which would trigger the appointment of an assignee to collect the debtor's assets and potentially seek to recover fraudulent conveyances.[37] The debtor could claim some modest exemptions and, only by the grace of a sufficient quantum of consenting creditors and the bankruptcy commissioners, obtain a discharge.[38] In the main, however, the 1800 Act was decidedly pro-creditor and operated somewhat like today's involuntary bankruptcy process.

      Subsequent bankruptcy laws became incrementally more beneficial to debtors. The Bankruptcy Act of 1841 allowed voluntary commencement of bankruptcy cases and expanded the class of eligible petitioners from solely merchants to all persons (involuntary cases remained limited to merchant debtors).[39] Although discharges could still be denied or constricted, debtors no longer needed the support of their creditors and "[m]any thousands of debtors were discharged" during the Act's brief tenure.[40] The Bankruptcy Act of 1867 continued the availability of voluntary bankruptcy relief (including by making corporations eligible debtors), expanded the bases on which discharges could be denied, and allowed debtors to access the often more favorable state exemption laws.[41]

      The nation's first permanent bankruptcy law, the Bankruptcy Act of 1898, "ushered in the modern era of liberal debtor treatment in United States bankruptcy laws," coupling a favorable set of discharge provisions with continued access to state-law exemptions.[42] Consistent with its new focus, a bankruptcy case filed under the Act during the Great Depression produced a Supreme Court decision containing a powerful articulation of the value of a "fresh start" to consumer debtors, including by grounding the bankruptcy discharge in both personal human liberty and broad public policy.[43] Still, "[m]uch of the 1898 Act was directed not

---

[37] *See, e.g.*, *Wood v. Owings*, 5 U.S. (1 Cranch) 239, 250-51 (1803); Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 AM. BANKR. INST. L. REV. 5, 14 (1995) (hereafter, "Tabb Article").

[38] *See, e.g.*, Tabb Article at 15.

[39] *See, e.g.*, *id.* at 16-17.

[40] *See id.* at 18.

[41] *See, e.g.*, *id.* at 18-21.

[42] *See id.* at 24.

[43] *See Local Loan Co. v. Hunt*, 292 U.S. 234 (1934). The potent language used by the Supreme Court in this opinion has inspired generations of consumer bankruptcy attorneys, as well as policy advocates seeking to preserve the scope and viability of a broad bankruptcy discharge for individual debtors. *See, e.g.*, Kenneth N. Klee & Whitman L. Holt, BANKRUPTCY AND THE SUPREME COURT: 1801-2014 at 318 (West Academic 2015)

at debtor relief, but rather at facilitating the equitable and efficient administration and distribution of the debtor's property to creditors."[44]

The Bankruptcy Code we use today attempts to harmonize divergent principles that balance the interests of debtors, creditors, and other parties and "standardizes an expansive (and sometimes unruly) area of law."[45] The result is an "intricate and highly reticulated statutory scheme" filled with lengthy provisions containing detailed rules, exceptions, and exceptions to exceptions.[46] In fact, "the wide array of divergent 'purposes' embodied in the Code" often pull in inconsistent or indeterminate directions when interpreting statutory text.[47] Furthermore, the Bankruptcy Code contains parts designed to advance specific policy ends that do not rise to the level of generalizable purposes transcending the statute as a whole.[48] There are nevertheless basic principles undergirding the bankruptcy system. A few of these foundational principles include:

- Obtaining a discharge, which provides the proverbial "fresh start" for an honest debtor, is a long-settled essence of bankruptcy, which means, among other things, that exceptions to or limitations on discharge should be narrowly construed.[49]

---

(describing how "the Court made a powerful statement that would serve as the backbone of American consumer bankruptcy law for the next 70 years"); Lee Dembart & Bruce A. Markell, *Alive at 25? A Short Review of the Supreme Court's Bankruptcy Jurisprudence, 1979-2004*, 78 AM. BANKR. L.J. 373, 376 (2004) (observing how the Supreme Court "has recognized the salutary aspect of the discharge in many ways, but none more concise and eloquent than in *Local Loan Co. v. Hunt*").

[44] Tabb Article at 25.

[45] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).

[46] *See Terio v. Terio (In re Terio)*, 158 B.R. 907, 912 (S.D.N.Y. 1993), *aff'd*, 23 F.3d 397 (2d Cir. 1994). For specific examples, one need only skim the pages of text contained in Bankruptcy Code sections 362 and 522.

[47] *See, e.g.*, *In re Sisk*, 962 F.3d 1133, 1150 (9th Cir. 2020).

[48] By way of example, Bankruptcy Code section 557 sets forth detailed rules regarding the determination of rights relating to grain, but the statute in general has no grain-related overriding purpose. *See also, e.g.*, 11 U.S.C. §§ 1110, 1168.

[49] *See, e.g.*, *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"); *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (reciting the "the well-known guide that exceptions to discharge should be confined to those plainly expressed" (cleaned up)); *Liebke v. Thomas*, 116 U.S. 605, 607-08 (1886) ("It is of the essence of the bankrupt law that when the bankrupt has complied with all the conditions of the statute and surrendered his property, he should be released from all his debts, except those of a fiduciary character or founded in fraud . . . ."); *Buckingham v. McLean*, 54 U.S. (13 How.) 151, 166 (1852) (describing "the two great objects" of the federal bankruptcy law as its operation "to grant a discharge to honest debtors who should conform to its provisions, and to distribute their property ratably among all their creditors"). In the business chapter 11 context, the "fresh start" policy is

- Bankruptcy is not a haven for dishonest or evasive behavior; rather, full disclosure, transparency, and candor by all parties is necessary to protect the fairness and integrity of the process.[50]

- Similarly situated creditors should generally be treated as such, which means, among other things, that preferences or priorities should be interpreted narrowly and prepetition transactions should be scrutinized.[51]

- The bankruptcy estate should be maximized, whether for the benefit of the rehabilitated debtor or creditors who receive only a partial satisfaction of their claims.[52]

- For a variety of reasons, things should happen quickly in bankruptcy court; debtors, trustees, and others must move their cases forward in a prompt and efficient fashion.[53]

---

largely replaced with the goal of preserving enterprise value, jobs, and the like through reorganization. *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984).

[50] *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 427 (2014) (articulating denial of discharge, judicial sanctions, and criminal sentencing as examples of ways in which courts could address dishonest debtors); *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (noting how "judicial estoppel must be applied in such a way as to deter dishonest debtors, whose failure to fully and honestly disclose all their assets undermines the integrity of the bankruptcy system"); *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

[51] *See, e.g.*, *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) (finding guidance in "the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed"); *Young v. Higbee*, 324 U.S. 204, 210 (1945) (discussing how "historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets"); *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941) (Douglas, J.) ("[T]he theme of the Bankruptcy Act is equality of distribution. To bring himself outside of that rule an unsecured creditor carries a burden of showing by clear and convincing evidence that its application to his case so as to deny him priority would work an injustice." (citation omitted)); *Shawhan v. Wherritt*, 48 U.S. (7 How.) 627, 644 (1849) (noting how the "policy and aim of bankrupt laws are to compel an equal distribution of the assets of the bankrupt among all his creditors"; further observing that this "aim is to divide the assets equally, and therefore equitably"). *But see* David A. Skeel, Jr., *The Empty Idea of "Equality of Creditors"*, 166 U. PA. L. REV. 699 (2018).

[52] *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (referencing "maximizing the value of the bankruptcy estate" as being among the "significant Code-related objectives"); *Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (highlighting how "Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate"); *Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978, 981 (9th Cir. 2007) (relying on the "bankruptcy policy" of applying the Bankruptcy Code "to maximize the value of the estate to creditors").

[53] *See, e.g.*, *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy."); *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (describing longstanding recognition "that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (quoting *Ex parte Christy*, 44 U.S. (3 How.)

One or more of these five central principles will typically play a role in the resolution of a bankruptcy dispute.

*The "Cause" Toggle*

The Bankruptcy Code lays different tracks that a given debtor may attempt to travel. These tracks typically lead to strikingly different destinations. For example, eligible consumer debtors may file a chapter 7 case to obtain a quick discharge in exchange for liquidation of all nonexempt assets. The consumer debtor may also file a chapter 13 case to attempt a repayment plan of longer duration that permits retention of nonexempt assets.[54] Corporations can also liquidate in chapter 7 or attempt to reorganize (or perhaps eventually liquidate in a different fashion) through chapter 11.

The statute allows cases to hop tracks or leave the system entirely, either via a debtor's act or pursuant to bankruptcy court order.[55] The standard for judicial dismissal or conversion is generally one of "cause"[56] – this triggers a broad, expansive analysis regarding which track, if any, is best. Although the statute itself and case law articulate lists of factors that are commonly considered in a "cause" analysis, those factors are necessarily nonexclusive insofar as the analysis must rest on a holistic assessment of the unique aspects of a particular case.[57] This

---

292, 312 (1845))); *Wiswall v. Campbell*, 93 U.S. (3 Otto) 347, 350-51 (1876) (emphasizing how "[p]rompt action is everywhere required by law," and that this principle requires quick resolutions of claims against a bankruptcy estate, as "[w]ithout it there can be no dividend"); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1875) (discussing how "[i]t is obviously one of the purposes of the Bankrupt law, that there should be a speedy disposition of the bankrupt's assets," which is a goal "only second in importance to securing equality of distribution").

[54] *See, e.g.*, *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835-36 (2015) (contrasting the "two roads" of chapter 7 and chapter 13 and explaining that conversion between chapters means that "[t]he existing case continues along another track" and invokes different structural features).

[55] There are limitations on what both debtors and courts may do. For instance, on the former front, the powers under Bankruptcy Code section 105(a) allow the court to block a debtor's otherwise unconstrained right of conversion if that debtor is acting in bad faith. *See Marrama*, 549 U.S. at 375-76. On the latter front, an individual debtor's chapter 7 case cannot be converted to chapter 11 or chapter 13 without the debtor's consent. *See* 11 U.S.C. § 707(b)(1).

[56] *See, e.g.*, 11 U.S.C. §§ 707(a), 1112(b)(1), 1208(c), 1307(c). In some instances, the statute gives little or no discretion to the bankruptcy court. For example, the so-called "means test" requires dismissal as a result of a statutory presumption of abuse flowing from simple mathematic calculations that no judge has the ability to alter. *See id.* § 707(b)(2).

[57] *See, e.g.*, *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 57-59 (2d Cir. 2018) (listing nine "cause" factors considered when analyzing whether to dismiss involuntary chapter 7 case, but emphasizing discretionary and case-by-case nature of the inquiry); *HSBC Bank USA, N.A. v. Blendheim (In re Blendheim)*, 803 F.3d 477, 499 (9th Cir. 2015) (describing case-by-case and totality-of-the-circumstances nature of a "cause" analysis

holistic assessment must also include consideration of the fundamental purposes and principles of United States bankruptcy law, as described above.

Applying this all-inclusive approach here, the court must measure the facts unique to this case against the principles underlying bankruptcy law to determine whether a change in tracks is warranted or whether the case should be purged from the system entirely.

## *Dismissal or Conversion for "Cause"*

In balancing the protections enjoyed by creditors with the ever-evolving benefits enjoyed by debtors, a court may dismiss or convert a chapter 13 case only "for cause" under 11 U.S.C. § 1307(c). The subsection sets forth a nonexclusive list of items that specifically constitute cause for dismissal.[58] Upon finding cause to convert or dismiss, this provision also requires a court to determine which is in the "best interests of creditors and the estate."[59]

### I. Unreasonable and Prejudicial Delay

To preserve the pace and integrity of the bankruptcy process, the first of the bases enumerated in subsection 1307(c) allows a court to dismiss or convert a chapter 13 case based on "unreasonable delay by the debtor that is prejudicial to creditors."[60] The chapter 13 trustee explicitly seeks conversion under this provision and avers that the "creditors and Trustee have been unreasonably delayed in their efforts by the Debtors' conduct."[61]

---

under section 1307(c)); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253(11th Cir. 2013) (affirming dismissal of voluntary chapter 7 case based on bankruptcy court's consideration of "a list of fifteen non-dispositive factors"; explaining in detail how the "cause" analysis under all chapters of the Bankruptcy Code implicates "a totality-of-the-circumstances approach" under which the court may, in its discretion, consider any relevant unenumerated factors presented); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 159-62 (3d Cir. 1999) (detailing how the "cause" analysis under section 1112(b) is expansive, grounded in equitable discretion, not limited to consideration of the factors listed in the statute, and always tethered to "the Code's underlying principles"); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (holding that "cause" for dismissal can be established through an "amalgam" of case-specific factors, including considerations beyond those specified in the statute).

58   11 U.S.C. § 1307(c)(1)-(11).

59   *See Brown v. Billingslea (In re Brown)*, 2015 Bankr. LEXIS 3625, at *16-17 (B.A.P. 9th Cir. Oct. 26, 2015).

60   11 U.S.C. § 1307(c)(1).

61   ECF No. 93 at 6:14-15.

The adjective "unreasonable" qualifying the type of delay warranting dismissal or conversion appears to refer to the nature and duration of any disruption. The trustee points out that the "Debtors have had more than a year to accurately disclose their income, assets, correct any omissions and propose a confirmable Plan."[62] While the duration of this case may have become somewhat sigh inducing (including for both attorneys handling the Scotco adversary proceeding), unfortunately this purely temporal aspect stands with other cases that have not inspired motions to convert or dismiss. Thus, it is unclear whether any delay attributable to the debtors is "unreasonable" for purposes here. Such delay is certainly at odds with bankruptcy's general need for speed but not its central objective to provide honest debtors with a reasonable opportunity to obtain a fresh start.

Even unreasonable delay is insufficient, however; a necessary condition to converting or dismissing under section 1307(c)(1) is that any delay must also be "prejudicial to creditors." The trustee does not allege in the motion to convert that any delay resulted in specific prejudice to creditors.[63] It seems the trustee's implicit argument is that the prejudice is the delay itself. But again, the process in this case has been longer than typical but not fantastically so. To be sure, the debtors' sluggishness is discouraged, but the record before the court does not allow for a finding of actual resulting creditor prejudice.

## II. <u>Bad Faith</u>

"Bad faith" is not a basis for dismissal or conversion specifically enumerated in section 1307(c). However, in denying refuge to the devious and elusive debtor, the Ninth Circuit Court of Appeals has held that "cause" for dismissal or conversion includes filing a petition in bad faith.[64] In doing so, the court imposed a "totality of the circumstances" test designed to incorporate the type of holistic assessment discussed above.[65] Among other things, this comprehensive analysis requires a court to consider factors used to determine whether a debtor has proposed a plan in bad faith.[66] These *Eisen* factors are as follows: (1) whether the

---

[62] *Id.* at 6:13-14.

[63] The trustee does argue that creditors will be prejudiced by dismissal rather than conversion. The court addresses these contentions below.

[64] *See In re Blendheim*, 803 F.3d at 499.

[65] *See Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir. 1994).

[66] *See id.*

debtor misrepresented facts in the petition, unfairly manipulated the Code, or filed a chapter 13 petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended only to defeat state court litigation; and (4) whether "egregious behavior is present."[67]

The chapter 13 trustee does not specifically request conversion on the basis of bad faith but does, in a few instances, reference bad faith and language used in the related analysis.[68] Thus, the court construes the trustee's motion as one seeking conversion on the basis of bad faith.

The grounds relied on for any relief on this basis must be that, first, the debtors initially failed to disclose insurance proceeds in the form of two checks for $15,174.61 and $17,990.85 cashed postpetition.[69] Second, that the debtors received insurance proceeds totaling $62,414.71 to replace the contents of their home, but initially listed only $6,800 worth of items under the general description "Household Goods and Furniture."[70] Finally, in an apparent effort to allay the trustee's concerns, the debtors (i) amended their Schedule B to include two Polaris ATVs with a total value of $5,200 and increased the value of "Household Goods and Furniture" to $15,770 and (ii) provided the trustee with numerous receipts of items purchased with the insurance proceeds and a detailed inventory of the contents of their home.[71] These disclosures only exacerbated the trustee's suspicions that the debtors may possess even more undisclosed personal property.

In applying the *Eisen* factors, the court determines that only the first weighs against the debtors. The trustee has presented evidence to show that the debtors misrepresented facts by initially failing to disclose the Polaris ATVs and checks that the debtors cashed postpetition.[72] There is also evidence, however, that the

---

[67] *See In re Blendheim*, 803 F.3d. at 499.

[68] *See* ECF No. 93 at 1:16-18 ("given the totality of the circumstances this case was not filed in good faith"); 5:24-25 ("Debtors have not demonstrated that the filing of this case was in good faith."); 5:26-6:3 ("Debtors' conduct . . . lends itself to bad faith."); 6:18 ("totality of the circumstances"). The trustee does not identify or discuss the particular factors a court must consider when dismissing or converting based on bad faith.

[69] *See* ECF No. 95, Ex. 2.

[70] *See* ECF No. 93 at ¶ 8. The trustee's implicit argument here is that the debtors must have obtained much more personal property from such a large pool of funds. If the case were not dismissed, the court would schedule an evidentiary hearing at which the debtors would need to explain this significant value differential. Even exceptionally rapid depreciation would not close the gap that appears to exist between these numbers.

[71] *See* ECF No. 95, Exs. 3, 4.

[72] The trustee presents evidence reflecting that the insurance carrier issued the checks approximately one month prior to the petition date and that the debtors deposited the checks approximately six weeks after the petition

debtors attempted to remedy any defects by amending their schedules and complying with the trustee's requests for documentation. While complete and comprehensive disclosure is crucial to protect the integrity of the bankruptcy process, perfection is not a feasible measuring stick. Rather, the process must make room for prompt and candid cure of nondisclosures.

The second factor weighs in favor of the debtors. While Mr. Zamora previously filed two bankruptcy petitions, both cases ended in discharge with no evidence or allegation of wrongdoing.[73] There is no indication that Mrs. Zamora previously filed any bankruptcy petitions.

The third factor also weighs in favor of the debtors. While it is possible that a contract dispute may have arisen between the debtors and Scotco prior to the petition date, there is no evidence or allegation by any party that the debtors filed their chapter 7 petition to defeat any creditor's state-court remedies.

Finally, the fourth factor does not weigh for or against the debtors. While the court agrees that there is some evidence of misconduct, the evidence does not indicate that they engaged in behavior that could be described as "egregious." The debtors have amended their schedules to disclose their interest in further assets and provided detailed inventories of personal property in response to the trustee's concerns. Unfortunately, but understandably, these disclosures only fueled further misgivings rather than dispelled any doubt. The court sympathizes with the trustee's suspicions of additional misconduct, but the court must rule on the existing record, which does not contain conclusive evidence of identifiable egregious behavior.

Based on the existing evidence, the court cannot conclude that the actual filing or conversion of the debtors' case constituted the type or level of misconduct requiring dismissal or conversion under the *Eisen* factors and the totality of the circumstances generally.

III. <u>Denial of Confirmation</u>

To ensure the need for speed and efficiency required in bankruptcy cases, a court may dismiss or convert a case under 11 U.S.C. § 1307(c)(5) after denying

---

date. *See* ECF No. 95, Ex. 2. However, it is unclear whether the debtors actually received the checks before the petition date or knew they were entitled to the funds on that date. The evidence does show that the debtors deposited the checks on the date initially set for the section 341(a) meeting. *See id.*, ECF No. 8.

[73] *See* Bankr. Case Nos. 00-03303 (chapter 13); 07-01223 (chapter 7).

confirmation of a chapter 13 plan and denying additional time to remedy any defects. Although the motion does not recite an explicit statutory basis, the court construes the chapter 13 trustee's March 6, 2020 motion to dismiss as one seeking relief on this basis.

At the third continued confirmation hearing, the court moved the matter to the dismissal docket.[74] At the dismissal hearing, the trustee pressed his objections and maintained that the plan was still not confirmable.[75] The debtor did not dispute the trustee's position but asserted that an evidentiary hearing would be necessary to resolve the issues related to valuing the debtors' personal property and any remaining disputes between the debtors and the chapter 13 trustee.[76] Furthermore, the debtors have not yet addressed their mortgage servicer's objection related to mortgage arrears. Thus, there is no dispute that the plan is not confirmable as proposed.

To the extent the court has not explicitly denied confirmation of the debtors' plan or denied additional time to amend or modify the plan, the court does so now. The debtors have taken several bites at the confirmation apple over a period of many months (and even more months before that during which they enjoyed the protections offered by chapter 7); in this context, the court cannot conclude more bites are warranted. On these bases, therefore, the court grants the chapter 13 trustee's motion presented under section 1307(c)(5).

*Best Interests of Creditors*

Having found "cause" sufficient to convert or dismiss the debtor's chapter 13 case, the court must now determine which path is in the "best interests of creditors and the estate."[77] This determination relies on heavy consideration of several, possibly competing, bankruptcy maxims.

In pushing conversion, the trustee states that dismissal would cause creditors "undue hardship."[78] In explaining, the trustee points to the "time and expense"

---

[74] *See* ECF No. 90.

[75] *See* ECF No. 106.

[76] *See id.*

[77] *See* 11 U.S.C. § 1307(c).

[78] ECF No. 93 at 2:1-2.

MEMORANDUM DISPOSITION . . .     Page 15

Scotco Construction incurred in prosecuting its nondischargeability action.[79] While the court agrees that this is the type of argument one might expect Scotco to press, Scotco did not do so. Scotco, which presently holds over 50% of the unsecured debt claimed in this case, has demonstrated a strong inclination to protect its rights through competent counsel. Yet Scotco has declined to join or otherwise comment on the trustee's motion to convert.

Moreover, during the most recent adversary status conference, counsel for Scotco expressed a personal preference to proceed in bankruptcy court but indicated no such bias on the part of his client and expressed a readiness to pursue a breach of contract claim in state court.[80] Consistently, at the prior status conference, counsel for Scotco stated that a breach of contract claim "could be adjudicated rather quickly and cost effectively [in state court] if the chapter 13 case is dismissed."[81] For these reasons, the court cannot entertain any contrary arguments made by the trustee on Scotco's behalf.

Ignoring Scotco's silence, there is no objective indication that dismissal would prove less advantageous to the creditor. The court and counsel for both parties have agreed that formal proceedings in the adversary proceeding should be tabled until the present matter is resolved. Thus, the adversary proceeding has not progressed to an appreciable degree. Moreover, all efforts expended by both parties in the adversary proceeding will likely remain useful in the anticipated breach-of-contract suit in state court or to settlement negotiations. In turn, should the debtors file another bankruptcy petition, any state court ruling on the matter will either render a second nondischargeability action unnecessary by eliminating Scotco's underlying claim or potentially trigger preclusion principles if Scotco files a subsequent adversary proceeding.

Finally, the trustee does not contend that the debtors retained any significant amounts of cash from the insurance proceeds, but instead believes that the debtors spent these funds to purchase personal property. If this proposition is correct, then conversion to a chapter 7 case and the subsequent liquidation of any nonexempt personal property would likely produce cash far below the replacement value assessed for insurance purposes. Thus, if Scotco fails in its nondischargeability action, there is a high probability that the creditor would receive only a small

---

[79] *Id*. at 1:23-24.

[80] *See* Adv. Proc. No. 19-80021, ECF No. 31.

[81] *See id*., ECF No. 30.

**MEMORANDUM DISPOSITION . . .**     Page 16

19-01040-WLH13    Doc 109    Filed 07/27/20    Entered 07/27/20 14:57:04    Pg 16 of 17

percentage of its claim. Dismissal not only prevents discharge but keeps the claim intact – which may prove useful to Scotco in state court settlement negotiations. Overall, based on Scotco's representations and the court's independent analysis, the court cannot conclude that dismissal would prove prejudicial to Scotco and, if anything, actually appears more beneficial to that creditor.

The chapter 13 trustee has not addressed why dismissal would harm remaining creditors. There does not appear to be a substantial race of diligence, competing creditor interests, or allegations of avoidable transfers to warrant continuing a collective process under federal bankruptcy law. Moreover, because a liquidation is likely to reduce any recovery on the claims of unsecured creditors by a significant margin, the court ultimately concludes that these parties would also likely benefit from dismissal. For all the above reasons, then, the court determines that dismissal rather than conversion is in the best interests of the creditors and bankruptcy estate.

## SUMMATION

When applying the relevant statutory provisions and considering the central tenets of bankruptcy law, the evidence and allegations here do not compel dismissal or conversion for bad faith or unreasonable and prejudicial delay to creditors. However, the court finds "cause" for dismissal or conversion of this chapter 13 case under Bankruptcy Code section 1307(c)(5). Based on the reasons discussed above, the court has denied confirmation of the debtors' chapter 13 plan and denied additional time to remedy any defects after the debtors had five opportunities to present a confirmable plan. Because the best interests of the creditors and the estate favor dismissal rather than conversion, the court will dismiss the case in a separate order.